**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL NO. 1:02CV217**

| | |
|---|---|
| **REBECCA WILLIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **Vs.** ) | **MEMORANDUM** |
| ) | **OF OPINION** |
| **TOWN OF MARSHALL, NORTH** ) | |
| **CAROLINA, a corporation of the** ) | |
| **State of North Carolina,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court on the Defendant's motion for

summary judgment and the Plaintiff's motion for sanctions.

## I. PROCEDURAL HISTORY

This case was remanded to this Court from the Fourth Circuit Court

of Appeals. ***Willis v. Town of Marshall*, 426 F.3d 251 (4th Cir. 2005).**

The Fourth Circuit made the following rulings:

1. Recreational dancing is not protected by the First Amendment.

"Our conclusion that recreational dancing is not protected by the First

Amendment is largely dispositive of the other First Amendment claims raised by Willis." *Id.* **at 261.**

2. "Because Willis's dancing is not protected First Amendment activity, Willis had no protected right to associate for the purpose of dancing. We therefore need not consider Willis's associational claims further." *Id.*

3. The right to receive free speech in the form of listening to music is not sufficient to trigger First Amendment scrutiny as to the Town's dancing policy. "While application of the Town's policy on lewd dancing ultimately prevented Willis from exercising her right to listen, that attenuated, indirect effect on speech is insufficient to bring the First Amendment into play[.]" *Id.* **at 260.**

4. "Because recreational dancing of the type at issue in this case is not expressive conduct protected by the First Amendment, the factual dispute about the nature of Willis's dancing is not material to her First Amendment claim." *Id.* **at 261.**

5. As to the Town's policy on lewd dancing, there is no First Amendment issue. *Id.*

6. "Because the kind of dancing at issue here is not expressive conduct, the Town's regulation of it does not implicate the First Amendment[.]" *Id.* **at 262.** Thus, there was no occasion to consider whether the Town's policy is unconstitutionally vague and overbroad.

7. As to a facial challenge under the Equal Protection Clause, because recreational dancing is not constitutionally protected, the Town's decision to prohibit lewd dancing is reviewed under the lenient rational-basis standard and passes muster. *Id.* **at 263.**

8. The Circuit declined to consider whether Willis's banishment from The Depot infringed on her right to travel and be present in a public forum. "Whether we view Willis's substantive due process claim as involving a right to travel or a right of access to a public forum, the claim in reality . . . 'fully overlaps' her Equal Protection claim" and was properly rejected. *Id.* **at 266.**

9. The Circuit also declined to consider Willis' procedural due process claim. *Id.* **at 266-67.**

10. Willis did state a claim pursuant to *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000), that she was intentionally treated differently from others similarly situated. Therefore, granting summary

judgment was premature and the Court should have allowed discovery to proceed on the issue of whether "[t]he Town . . . banned only Willis; no action was taken against her unnamed partner."[1]  **_Id._, at 263-64.**

The parties have now concluded an extended period of discovery, as required by the remand.

## II.  STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  As the Supreme Court has observed, "this standard provides that the mere existence of _some_ alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no _genuine_ issue of _material_ fact."

**_Bouchat v. Baltimore Ravens Football Club, Inc._, 346 F.3d 514, 519 (4th**

**Cir. 2003) (quoting Fed. R. Civ. P. 56(e) and _Anderson v. Liberty_**

---

[1] On remand, the Plaintiff advised the Court that she would not seek a preliminary injunction to require the Town to readmit her to events at The Depot.  **Notification re Motion for Preliminary Injunction, filed February 9, 2006.**  This rendered moot that portion of the Fourth Circuit's opinion which remanded "for the district court to consider . . .  whether an injunction is warranted."  **_Willis_, 426 F.3d at 267.**

***Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).**  A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson, supra*).**  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  ***Bouchat*, 346 F.3d at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).**  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  ***Id.***

> A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial."  Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

***Id.* (quoting Fed. R. Civ. P. 56(e) and *Felty v. Graves-Humphreys Co.*, 818 F.3d 1126, 1128 (4th Cir. 1987)) (other internal citations omitted).**

Moreover, in considering the facts for the purposes of this motion, the

Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

### III. FINDINGS OF FACT

In the center of the Town of Marshall is the Marshall Depot, a former railroad depot leased by the Town for use as a community center. A committee appointed by the Town's Board of Aldermen coordinates events at the Depot. On Friday nights the Town opens the Depot and sponsors musical entertainment, permitting local groups to sign up for playing time. The Friday night concerts are for the benefit of the public and attended by community members of all ages. During the Friday night concerts, musicians perform on a stage, which is located in front of rows of auditorium-style seats where people can sit and listen to the music. There is no real dance floor in the Depot, but there is a small area off to the side of the stage and seating area where people often dance.

. . .

Willis lives in Madison County, North Carolina, just outside the boundaries of Marshall. She regularly attended the Friday night concerts, where she particularly enjoyed dancing. According to the Town's evidence, Willis danced in a sexually provocative manner – gyrating and simulating sexual intercourse with her partner while "hunch[ed]" on the floor. The Town's evidence indicates that Willis wore very short skirts and would frequently bend over while dancing, exposing her underwear, her buttocks, and her "privates." Community members were concerned about their children being exposed to Willis' dancing, and a number of them complained to members of the Depot Committee. The Town contends that members of the Depot Committee repeatedly spoke to Willis about her dancing and asked her to "please curtail the provocativeness of her

dances." Their requests were allegedly met with defiance. The Town says that rather than toning down her dancing, Willis began to dance even more provocatively.

. . .

[T]he Depot Committee ultimately decided to ban Willis from attending events at the Depot. . . . [T]his action followed.

**Willis, 426 F.3d at 254-55.**

At issue is whether other individuals similarly situated to Willis were

treated differently than her without a rational basis therefor.

Until late 2000, [Willis] was a regular at the [Depot] events, where she particularly enjoyed to dance. On December 12, 2000, the Mayor of Marshall, John Dodson, sent [Willis] a letter that read:

> Due to the inappropriate behavior exhibited by you and having received previous warnings from the Marshall Depot Committee it is the consensus of the Committee that you are banned from the Marshall Depot. This action is effective as of today's date.

. . .

The Committee chair, Retha Ward, and many others claim that members of the Committee repeatedly asked [Willis] to modify her behavior at the events.

**Willis v. Town of Marshall, 293 F.Supp.2d 608, 611-12 (W.D.N.C. 2003).**

Willis testified that at an unspecified time, Retha Ward "called me out

and asked me to cool it," referring to her dancing. **Deposition Transcript**

**of Rebecca Willis, filed April 10, 2007, at 17.**[2]  Bonnie Chandler was with

Ward and they spoke to Willis on the back porch of The Depot.  ***Id., at 20-

21.***  Ward told Willis that the Committee had been receiving complaints

about Willis's dancing and "we want you to cool it."  ***Id.***  Willis asked if she

should leave the dance and Ward said "oh no."  ***Id.***  In response, Willis

spoke with Everette Boone about Ward's conversation and he advised that

there were a lot of "old fogies" at the dance.  ***Id., at 17, 21.***  Willis also

spoke with John Dodson, the mayor of Marshall, about the matter and he

told her that the Committee had rules and guidelines which it had to follow.

***Id., at 22.***  Dodson suggested she speak with the Town Board if she was

upset.  ***Id.***  Willis did call and ask to be put on the agenda but later

changed her mind because she did not feel she had done anything wrong.

***Id., at 43.***  She went back to The Depot and danced and took her name off

of the agenda.  ***Id.***  On another occasion, she was chastised by Evelyn

Clay.  ***Id., at 44.***  Eleven weeks after Ward spoke with Willis, Willis

received the letter banning her from dancing at The Depot.  ***Id., at 22.***  At

---

[2]In its motion for summary judgment, the Defendant referred to various portions of depositions as exhibits.  However, the Defendant failed to file copies of those exhibits with the motion.  As a result, the Court requested that the Defendant file the complete transcripts in order to expedite review of these matters.

an undisclosed time thereafter Willis appeared at a meeting of the Town Board and The Depot Committee with her attorney and she was given an opportunity to present her position.  *Id.*, **at 26-7.**

On another occasion, Willis witnessed Ward speak to the entire audience during a dance and warn that if any dancer did not abide by the rules, they would be automatically taken to jail.  *Id.*, **at 18.**  In fact, Willis saw one woman being escorted from The Depot by a police officer although she did not know the reason.  *Id.*  Willis testified that there were two other people whom she knew had received letters from the Committee banning them from The Depot.  *Id.*, **at 28.**

Willis testified that someone complained to her about her dancing at the Moose Lodge in Marion, North Carolina.  *Id.*, **at 51-52.**  Willis also testified that despite complaints about her dancing, she has never asked the complaining person to explain what is wrong because "I just I didn't feel like there's anything wrong with my dancing."  *Id.*, **at 52.**  She testified that she has danced doing "bumping and grinding" at Nashville Sounds, Cowboy's and Mama's.  *Id.*, **at 53.**  Willis testified that while that type of dancing was alright at those establishments, it would not have been at The Depot because that was a family atmosphere.  *Id.*, **at 53-54.**

Willis submitted for consideration two videotapes which were recorded by H. Winston Cook which show Willis dancing at the Depot. **Exhibits A and B** *attached to* **Exhibit 10, Fourth Affidavit of Rebecca Willis,** *included in* **Plaintiff's Appendix.** Cook described Willis's dancing style as "burlesque" but stated that in the videotapes she was doing "a more calm version of what she has done in the past." **Exhibit 6, Excerpts from Deposition of H. Winston Cook, Jr., taken November 14, 2006,** *included in* **Plaintiff's Appendix, at 26.** "She is doing . . . some of the things which you might encounter in seeing a burlesque show." *Id.* **at 27.** "The other tapes that I've made, I believe, show her dancing in a worse manner than she is on the tape I brought you. I just did not have the time to go through to get them." *Id.*

Because the Plaintiff requested the Court to view the videotapes, they were reviewed. It is indeed the case that the Plaintiff frequently bends over, waves her hands and moves her hips. It is unnecessary to further characterize her style of dance.

At the time of his deposition in November 2006, Everette Boone had been member of The Depot Committee for the past nine years. **Deposition Transcript of Everette Boone, filed April 10, 2007, at 8.**

Boone functions as the master of ceremonies and has only missed about twelve Friday nights at The Depot. *Id.*, at 17. Almost all of the dancing at The Depot is clogging or slow dancing. *Id.*, at 36. The first time he saw Willis at The Depot was when she was married to her first husband. *Id.* She danced with her husband in a normal manner. *Id.* Over the years, Willis's style of dancing changed. *Id.*, at 40. Willis danced "in a vulgar manner" although the people with whom she danced did not. *Id.*, at 44. "[S]he did it all by herself." *Id.*, at 49. The other times when Boone had seen dancing like that, he had been in strip bars or discos. *Id.*, at 50. The Committee received a complaint from W.C. Allen about Willis's dancing. *Id.*, at 53. In fact, some people stopped coming to The Depot because of Willis's dancing. *Id.*, at 54-55. He received numerous complaints from people, some of whom were tourists. *Id.*, at 60-61. The complaints went on for about six months before Willis was banned. *Id.*, at 62. Willis's dress changed after she became separated from her husband. *Id.*, at 63. At that time, her skirts became skimpy and short. *Id.* When she was married to her first husband, she did not dress or dance inappropriately. *Id.*

Boone testified that Ward, Chandler and he had all three warned Willis about her dancing before she was ultimately banned. *Id.*, **at 68.** "I told her if she didn't stop dancing the way she did, that we would have to get rid of her." *Id.* "She told me she'd do what she damn pleased." *Id.*, **at 69.**

On one occasion, Boone told a member of a band that he should stop playing an inappropriate song. *Id.*, **at 56.** The song was inappropriate because The Depot is a family setting. *Id.*, **at 57.** The singer did not sing another inappropriate song. *Id.*, **at 97.** On another occasion, a female dancer threw her skirt over the top of her head. *Id.*, **at 72.** Boone went onto the dance floor and told the woman she would have to leave. *Id.* When she refused, Boone had her escorted off of the premises by a police officer. *Id.* "And she never came back. But she did, I think – called Mrs. Ward [the chair of the Depot Committee] and apologized and said she wouldn't never be back." *Id.* Thus, there was no need for the committee to deal with the issue of banning this particular dancer.

Boone also testified that Dennis "Dink" Brown, Judy Mathis, and Tanya Berry were banned from the Depot. *Id.* **at 80-81.** Mathis and Berry

were sitting behind a couple from out of state and kept kicking the backs of the seats in front of them in which the couple was sitting.  *Id., at 75.*  When the couple asked them to stop, Mathis and Berry became loud and began to curse at the couple.  *Id.*  Boone asked Mathis and Berry to go outside to speak with him and they did so but again, became loud and began to curse at him.  *Id., at 76.*  At that point, Brown came outside and threatened to hit Boone.  *Id.*  The Committee voted to ban all three.  *Id.*

Lucille Shelton was banned for fighting; however, whether she was formally banned or not is unclear.  *Id. at 128-29.*  She was told to leave and never come back and she never came back.  *Id. at 80-81.*  As a result, it was unnecessary to send her a letter.  *Id.*  At some point later, she asked the Committee for reinstatement.  *Id. at 129.*

Carol Stamey was asked to leave the Depot one evening because he had an alcoholic beverage on his person.  *Id. at 85.*  The Committee dealt in the same manner with Maynard Arrington for the same conduct.  *Id. at 86.*  Neither Stamey nor Arrington ever returned or attempted to return to the Depot.  *Id. at 85-87.*  In fact, while Boone was on the Committee, his wife was fired from her job working in the kitchen because she cursed in

the kitchen.[3]  *Id.* **at 90.**  She was not banned however because "if we banned people for cursing, we would have to ban just about everybody that comes[.]"  *Id.***, at 92.**

Retha Ward has been the chairman of The Depot Committee since it was formed in 1996.  **Deposition Transcript of Retha Ward, filed April 10, 2007, at 11-12.**  In her testimony, she reiterated Boone's recollections concerning Stamey and Arrington as well as Shelton.  *Id.***, at 30-35.** Specifically, Ward testified that whenever the Committee had asked people to change their behavior or to leave, they did so.  *Id.*  Ward also recounted the incident involving the young woman who threw up her skirt.  *Id.***, at 35.** "[S]he called me and apologized. ... [S]he apologized for it and said she was sorry.  She wouldn't be back.  But I don't even know her name."  *Id.* Ward reiterated Boone's testimony concerning the fracas involving Dennis Brown, Judy Mathis, Tanya Berry and their banning.  *Id.***, at 36-39.**  They were banned because they continued to be disruptive after being asked to calm down.  *Id.***, at 89-90.**  On another occasion, Brown tried to sneak back

---

[3] Plaintiff's counsel cites a page of the transcript as containing testimony from Boone that his wife was fired for cursing.  **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed January 3, 2007, at 13.**  The page cited does not contain this statement.

into The Depot when he was intoxicated in order to talk with Ward. *Id.***, at 41.** The police removed him. *Id.* Later, when Dennis Brown had cancer, he asked to come back in order to apologize. *Id.* Three members of the Committee went to see Brown and he did apologize. *Id.***, at 40.** However, the Committee did not change its mind about the banning. *Id.*

Ward testified that when Willis was married to her first husband, her manner of dress and dancing was appropriate. *Id.***, at 47.** It changed, however, after they separated. *Id.* "[S]he got to dancing dirty like, insinuating, and things like that." *Id.***, at 48.** She was insinuating sex. *Id.* Ward never saw her dance like that with a partner, she was alone. *Id.***, at 50.** The conduct that Ward witnessed was enough to make Ward think Willis should be banned without regard to anything anyone else may have seen. *Id.***, at 59.**

Ward testified that she warned Willis numerous times about her dancing before the banning. *Id.***, at 61.**

> I said, Becky, if you don't stop this, we are going to have to ban you. You are going to have to quit coming to the Depot. The first time we did that, I had Bonnie Chandler with me, and when we told her, she said, Oh, Retha, I won't. I love to dance here. I won't do it. I'll behave myself. And the minute she got out and turned her back to us, she turned around and said we are just damn jealous of her. That is all that is wrong with us.

***Id.*, at 61-62.**

Later, Willis called Ward at home and asked if she was going ban Willis.

***Id.*, at 63.** "And I said, no, but if [you] behave yourself and act like you

should act, no. You are welcome to come. And she said, I will." ***Id.*** Ward

talked to Willis a third time about her dancing at The Depot about a month

later. ***Id.*, at 65.** Willis got "worse every week." ***Id.***

A. J. Bridges is a regular dancer at the Depot events. Ward testified

that Bridges "is just a comic." ***Id.*, at 117.** Ward testified that he did not

dance oddly but made too much noise with his feet. ***Id.*, at 118.** She

testified that the committee felt he did not need to make so much noise

with his feet; they spoke with him about the issue and he stopped. ***Id.* at**

**118-19 ("[H]e quit when we talked to him.").** "A. J. Loves to dance" and

he dances with anyone, whether they want to dance with him or not.

**Exhibit 4, Excerpts from the Deposition of Laura Ponder Smith, taken**

**November 8, 2006, *included in* Plaintiff's Appendix, at 19-20.** His style

of dancing is "clogging or – . . . he calls it 'buck dancing,'" which can be

loud. ***Id.*; Exhibit 6, Excerpts from the Deposition of H. Winston Cook,**

**taken November 14, 2006, *included in* Plaintiff's Appendix, at 33.**

However, he has never danced inappropriately. **Exhibit 4, Smith**

**Deposition Excerpts, *supra*; Exhibit 7, Excerpts from the Deposition**

**of Beverly Seevers, taken November 20, 2006, *included in* Plaintiff's**

**Appendix, at 49 ("He never, ever danced in an improper manner.").**

The minutes from the Marshall Depot and Caboose Committee

contain the following excerpts on the dates shown:

August 19, 1999

Regarding a fight between 3 women at the depot on Friday
8/13/99 it was felt that a letter to the aggressor should be
delivered prior to Friday 8/20.  That Leona would not be banned
at this time, but the town police will talk with her.  At the first
sign of any danger the person has to be asked to leave.  Gene
Wilds will inform the police officer to be aware of danger and
follow through.

**Exhibit 9, Minutes of the Meetings of the Marshall Depot and Caboose**

**Committee, dated June 19, 1996, through August 21, 2003, *included in***

**Plaintiff's Appendix.**

December 11, 2000

Chairman discussed telephone calls concerning one lady (sic)
type of dancing[4] and people who were drinking and talking filthy
language.  Retha and Bonnie to have discussion with involved
person.  Police to be informed about drinking.  Facts to be
checked before discussing.

---

[4] Although not explicitly stated, this reference is to Willis.  The
reference in the minutes shows that complaints were received about
Willis's dancing.

*Id.* **(footnote added).**

December 14, 2000

Primary function of the meeting was to discuss the disturbance at the last Friday night music event.  E. Boone was threatened. Everette Boone will announce that the depot music nights are a family oriented event.  Boone will meet with Town Attorney Larry Leake to compose a letter to the 4 people that were involved in the disturbance.  These letters will be delivered where possible or mailed registered.  If unable to deliver they will be handed out at the door. . . .  Letters of apology should be written to the people that were aggravated by the offenders. Caution should be taken with any person drinking or smelling of drink.

*Id.*

January 18, 2001

A music group that was banned form (sic) the depot would like to become reinstated and meet with the board to discuss this possibility.[5]  Discussion followed that our previous ruling should stick.  Have both sides of the story been heard.  This man Dennis Brown was the one that threatened Everette Boone. Forrest Jarrett feels he should talk with the town attorney about this and that was the consensus of the board.  Retha Ward will talk to Larry Leak about Dennis Brown.  Forrest Jarrett made a motion that Retha should talk to AJ Bridges on another matter.

*Id.*

February 15, 2001

_____

[5]Boone testified that he did not know which group this was as he had no recollection of a music group ever having been banned.  **Boone Deposition,** *supra.***, at 106.**

Discussion regarding drinking and violation of rules.  Retha spoke to AJ and was satisfied that he had not done anything inappropriate.  The deputy had checked out cars for any substances in the vehicles.

It was agreed that if someone had been banned once, they would not be allowed to return.  A girl from Haywood County was recognized as being asked not to come back.  She gave a false name trying to avoid recognition.  Retha will discuss writing a letter to her with town hall about keeping her away.

. . .

Additional rules need to be added to the existing list.  <u>No short shorts.  No mini skirts.</u>  Find correct words to use, such as appropriate dress required.

*Id.*

March 17, 2001

Motion . . . that G. Wild contact police on duty to pay more attention to people drinking especially the ones going to their cars and returning to building also cussing on porch or in building.

*Id.*

April 19, 2001

Any changes to the signs of "what to do or not to do" at the Depot are not to be changed per Larry Leake until the Willis issue is settled.  When that happens "No profanity" and "Dancing in the Auditorium only" should be added to the sign.

*Id.*

July 18, 2002

Retha Ward advised Dolly Boone [Everette Boone's wife] that her services in the concession area were terminated, effective immediately, due to complaints regarding bad language and rude behavior that occurred on a previous Friday night at the Depot. There was some discussion at this point. Mrs. Boone stated that she did nothing nor said anything wrong. Deputy Sheriff Shelton testified to what he saw and heard. Gene Wild, being in charge over the Depot cleaning, advised Mrs. Boone that her services were no longer required due to her failure to do her job[.] . . . Deputy Shelton discussed the ban of Dennis "Dink" Brown and advised the committee as to the details concerning his unacceptable behavior.

July 25, 2002

Retha Ward received complaints concerning young people running in and out while groups are performing thereby disrupting the entertainment. Forrest Jarrett suggested keeping good documentation, have the proper people talk to the young people and address the problem and then, if they fail to comply with rules, to ban them. . . . Discussion concerning Dennis Brown who had previously been banned and how he tried to enter the Depot on July 19, 2002. Everette Boone stated he had a confrontation with Mr. Brown.

*Id.*

Willis has not presented any evidence showing that the above individuals were "repeat offenders." The Defendant has submitted evidence, which is not refuted by Willis, that she was repeatedly asked to curtail her dress and dancing. **Exhibit 2, Excerpts from Boone Deposition,** *supra*, **at 55-56, 60-62, 68-70; Exhibit 3, Excerpts from Ward Deposition,** *supra*, **at 62-65; Exhibit 8, Excerpts from Willis**

**Deposition,** *supra***, at 17-21.**  In response to the motion for summary

judgment, Willis presented no evidence that any partner with whom she

danced engaged in any inappropriate behavior.


## IV.  DISCUSSION

According to Willis, the Town used its power to regulate the
behavior of those attending events at the Depot arbitrarily, by
singling her out for punishment, while refusing to punish others
who danced or dressed similarly.[6]  Among other things, Willis
notes that the Town submitted affidavits from community
members who stated that Willis and a dance partner "would
hunch on the floor, simulating sexual intercourse."  The Town,
however, banned only Willis; no action was taken against her
unnamed partner.

"The purpose of the equal protection clause of the Fourteenth
Amendment is to secure every person within the State's
jurisdiction against intentional and arbitrary discrimination,
whether occasioned by express terms of a statute or by its
improper execution through duly constituted agents."  Thus, the
Supreme Court has recognized the validity of "class of one"
Equal Protection claims, "where the plaintiff alleges that she
has been intentionally treated differently from others similarly
situated and that there is no rational basis for the difference in
treatment."  Willis's allegations of arbitrary singling-out by the
Town are sufficient to support an *Olech* "class of one" claim.

---

[6] The Court reads the remand from the Fourth Circuit as being limited
to whether Willis's "unnamed partner[s]" danced in a similar fashion to her
dancing.  The parties have expanded the scope in their briefs and in the
interest of finality in this contentiously litigated case, the Court will reach
the expanded scope.

The district court, however, granted summary judgment in favor of the Town. The court explained that "[e]ven if other people danced similarly to [Willis], there is no evidence that [the Town] received complaints regarding their behavior. Therefore, [the Town] did not irrationally treat [Willis] differently from anyone else." Even assuming that the absence of complaints about others would establish that Willis was not similarly situated to the other patrons, an issue we need not decide today, we conclude that the granting of summary judgment was premature. Although the Town asserts in its argument that it received no complaints about any other Depot dancer, there is no *evidence* in the record demonstrating the absence of complaints. Whether complaints were or were not received is a matter wholly within the knowledge of the Town. Because the district court granted summary judgment before allowing any discovery, Willis had no opportunity to demonstrate that others situated similarly in this regard were not treated similarly.

**Willis, 426 F.3d at 263 (quoting *Olech*, *supra*, at 564) (footnote added) (other citations omitted).** In other words, Willis must show, now that discovery has been allowed, that the Defendant, acting under color of state law, intentionally treated her differently from others similarly situated and there was no rational basis for the difference in treatment.

The Plaintiff admits that: "[I]n response to the Court's request for further evidence on the issue whether her partners danced inappropriately at the Depot, *Plaintiff has never contended that . . . any dance partner at the Marshall Depot, danced inappropriately*. Rather, the Town's pleadings, discovery responses, *and the Fourth Circuit's opinion have raised that*

*spector*." **Plaintiff's Response to Court's Request for Legal Authority,
filed December 21, 2006, at 6 (emphasis added).** Thus, the Plaintiff
admits that she never had any dance partner who at any time danced
inappropriately. In essence, she has admitted there are no others similarly
situated. She has, therefore, failed to bring forth any evidence in
opposition to the motion for summary judgment on the issue of disparate
treatment based on the conduct of any of her dance partners. **Albiero v.
City of Kankakee, 246 F.3d 927 (7th Cir. 2001) (Plaintiff failed to bring
forth evidence in opposition to summary judgment showing he was
treated differently from similarly situated landlords.).**

Willis argues that other *attendees*, as opposed to dance partners,
were treated less harshly than she. As noted, the Court finds this issue
goes beyond the scope of the remand from the Fourth Circuit but will be
considered in the interest of finality.

> [C]lass-of-one plaintiffs must show an extremely high degree of
> similarity between themselves and the persons to whom they
> compare themselves. This showing is more stringent than that
> used at the summary judgment stage in the employment
> discrimination context. This is because "the existence of
> persons in similar circumstances who received more favorable
> treatment than the plaintiff" in a class-of-one case "is offered to
> provide an inference that the plaintiff was intentionally singled
> out for reasons that so lack any reasonable nexus with a
> legitimate governmental policy that an improper purpose –

whether personal or otherwise – is all but certain."  Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

Generally, whether parties are similarly situated is a fact-intensive inquiry.  A court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated.

***Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (quoting**

***Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)) (other internal**

**citations omitted).**

As to this issue of similarity, the minutes of the Committee and the

testimony of various members show the following:

1.  When a female dancer threw her skirt over her head, she was

immediately escorted off the premises by a police officer.  She was not

given a warning; she was immediately removed from the Depot.  The same

woman apologized and stated she would voluntarily never return to the

Depot.  It was thus unnecessary for the Committee to reach the issue of

banning her.  ***Neilson*, *supra*, at 106 (Where the individuals alleged to**

**have been similarly situated admitted their wrongdoing and**
**voluntarily accepted the consequences of their actions, they are as a**
**matter of law not similarly situated.).**

2.  When A. J. Bridges' clogging became too loud, he was told to
quiet down and did so.  *Id*.  Although not clear from the record or evidence
presented by the Plaintiff, it appears he was investigated and "cleared" of
any inappropriate behavior.  *Id.*; *Nes v. Anne Arundel County*, **95 F.**
**App'x 497 (4ᵗʰ Cir. 2004) (Summary judgment was appropriate for the**
**defendant because there was a rational basis for treating the parties**
**differently.).**  And, when spoken to by the Depot Committee, he voluntarily
conformed his conduct.  *Neilson, supra*.

3.  After a fight broke out among three women, the ring leader was
sent a warning letter and the Committee had a police officer speak with
her.  *Id*. **("[T]he comparisons to [the ring leader] are far too remote.**
**To be sure, [she] committed offenses that some rational people might**
**deem as or more serious than [Willis's] offense.  However, other**
**rational people might regard them as less serious in light of the**
**[presence of children during Willis's dancing].").**  There is no evidence
that this woman repeatedly fought at the Depot; unlike the evidence that

Willis was repeatedly asked to reform her conduct and refused to do so.
*Id.*

4.  Letters were sent to Brown, Mathis and Berry banning them from The Depot.  Mathis and Berry kicked the seats in front of them, offending out of town tourists and then used curse words when the visitors complained.  When asked to go outside, they repeated their conduct.  Brown threatened to hit Boone.  They were immediately banned as opposed to Willis who received repeated warnings.  Thus, Willis has neither alleged nor shown that these individuals were similarly situated.[7]
**Id. at 105 ("[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be ... whether they are *prima facie* identical.") (quotation omitted).**

5. When "Dink" Brown later tried to sneak back in to The Depot, he was turned away.  In other words, the Committee refused to "lift" the ban.  To the extent that Willis claims an individual who has threatened a Committee member was similarly situated, Willis has failed to show that he was treated more favorably than she.  To the extent that her argument is

---

[7]Moreover, as noted *infra*, to the extent they could be deemed similarly situated, they were not treated differently.  In fact, they were treated more harshly because they were banned after one incident.

that his conduct was more serious than hers, he was banned after a single incident.  Willis was repeatedly asked to reform her behavior.  ***Nes, supra.***

6.  A young woman from Haywood County was banned as well. When she tried to sneak in, she was turned away and a letter was to be sent to her.  There is no evidence in the record as to the reason for banning this woman; therefore, Willis has failed to prove she is similarly situated.  ***Id.***

7.  Two men were sent home for having alcohol on their persons. There is no evidence in the record that these men repeatedly did this and thus were banned.  In fact, the evidence is that they did not return at all. ***Neilson, supra.***

8.  The evidence is conflicting as to whether Shelton was banned for fighting or simply told not to return.  There is also no evidence that she repeatedly fought at the Depot.

9. The Committee uniformly held steadfast on this issue: once banned a person could never come back.

10.  The wife of a Committee member was disciplined and fired for her behavior and language.

11.  Finally, young people who did not behave would be banned.

The Court does not find that these individuals were similarly situated to

Willis because their behavior did not repeatedly occur at The Depot. Every

such incident was a one time occurrence with which the Committee dealt a

swift disciplinary hand. ***Jicarilla Apache Nation v. Rio Arriba County***,

**440 F.3d 1202, 1211 (10th Cir. 2006) ("The Equal Protection Clause**

**imposes no duty under a class-of-one analysis to disregard costs or**

**to ferret out information about other parties who may or may not be**

**similarly situated.").**

> [At the summary judgment stage], courts have insisted that
> plaintiffs demonstrate similarity in all material respects. . . .
> [W]hen the class consists of one person or entity, it is
> exceedingly difficult to demonstrate that any difference in
> treatment is not attributable to a quirk of the plaintiff or even to
> the fallibility of administrators whose inconsistency is as
> random as it is inevitable. Accordingly courts have imposed
> exacting burdens on plaintiffs to demonstrate similarity in class-
> of-one cases. . . . [T]here may be material distinctions between
> allegedly similarly situated parties, as well as a ready supply of
> rational and not wholly arbitrary reasons for differential
> treatment. Thus, [Willis] cannot prevail if there is *any* material
> difference between [her] and allegedly similarly situated parties
> that relates to a governmental interest.

***Id.* at 1212-13 (internal citations omitted).** Here, the material difference

is that Willis was repeatedly asked to conform her conduct, a request

which related to a governmental interest.

Moreover, assuming *arguendo* that these individuals were similarly situated, the Court cannot find that Willis was intentionally treated differently.  The Committee was consistent in its approach.  Behavior which was potentially dangerous was dealt with by immediate removal from the premises.  Behavior which was less serious, such as Bridges' loud clogging, was dealt with by having a discussion with the offending party.  But Willis was the only individual identified who was spoken with repeatedly and who refused to conform her conduct to the dictates of the Committee.  **Id. at 1209 ("In the paradignmatic class-of-one case, a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive.");  Albiero, supra (Plaintiff failed to bring forth evidence in opposition to summary judgment showing he was treated differently from similarly situated landlords.); Hinton v. Conner, 366 F.Supp.2d 297, 313 (M.D.N.C. 2005) (summary judgment appropriate when plaintiff produced no evidence that other similarly situated employees were treated differently).**

Assuming *arguendo* that these individuals were similarly situated and Willis was treated differently, there is a rational basis for the difference in treatment. **McWaters v. Cosby, 54 F. App'x 379, 383 (4th Cir. 2002) (Individual board member who was singled out for investigation of excessive travel expenses failed to state a class-of-one claim because "even a cursory review of the facts *as alleged in her complaint* demonstrates that she has not shown a violation of her equal protection rights, because numerous rational bases for the defendants' actions suggest themselves even from these facts." Thus, the district court's dismissal for failure to state a claim was affirmed.).** That is, assuming that Willis's dress was not inappropriate and that her dancing was merely "exuberant," the Town received complaints about her and warned her in the same manner as they dealt with Bridges. Moreover, the only two individuals identified as being disciplined due to their dancing, Bridges and the unidentified woman, both either admitted culpability, apologized and/or agreed to curtail their conduct. **Jicarilla Apache Nation, 440 F.3d at 1210 ("If there was an objectively reasonable basis for the Defendant['s] actions in this case, the district court did not err in granting summary judgment in favor of the**

**Defendant[ ] on that ground without allowing further discovery on the**

**question of subjective ill will.").** Indeed, even in response to this motion,

Willis persists in her claim that she never dressed or danced

inappropriately. ***Hinton*, 366 F.Supp.2d at 314 ("The City of Durham has**

**a rational interest in its employees following conflict of interest**

**regulations and terminating an employee who fails to act in**

**accordance with the regulation conceivably furthers that interest.").**

Thus, the difference between Willis and the other two dancers is that she

continued the behavior and the Town continued to receive complaints

about her behavior after she had been warned. Therefore, the Town had a

rational basis for treating her differently.

The other individuals as to whom Willis claims favorable treatment

were either banned or told to leave after a single incident. Faced with

Willis's repeated refusal to conform her conduct, the Defendant determined

to ban her from the Depot. In this regard, Willis's argument that her dance

and dress were appropriate is not the issue; the Town had the right to ask

her to conform to their rules, that right was rationally related to the goals of

the Depot and Willis refused. ***Jicarilla Apache Nation, supra*, at 1211**

**("We ask not whether the Defendants' proffered justifications were**

**sincere, but whether they were objectively reasonable.").** This is an

"objectively reasonable rationale for differential treatment, under a class-of-

one theory." *Id.* **at 1212.**

> Where, as here, no suspect class or fundamental right is
> implicated, governmental action subject to equal protection
> scrutiny under the rational basis test must be sustained if *any*
> conceivable basis rationally supports it. The [Town] has no
> obligation to produce evidence to sustain the rationality of its
> action; its choice is presumptively valid and "may be based on
> rational speculation unsupported by evidence or empirical
> data.". . . An equal protection violation will be made out only if
> the [Town's] action is shown to be "irrational."

*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County*, **430 F.3d 783, 790-**

**91 (6th Cir. 2005) (quoting *Fed. Commc'ns Comm'n v. Beach**

*Commc'ns, Inc.*, **508 U. S. 307, 315 (1993)).** The undersigned cannot

find the Town's decision to ban Willis irrational. Regardless of whether she

thought her dress and dance appropriate, Willis has failed to show that the

Town's determination that she was inappropriate was irrational. "[T]he

wisdom, fairness and logic of the [Town's] choice are all matters beyond

the purview of [the Court's] scrutiny. Because [Willis] is unable to disprove

all conceivable justifications for the [Town's] decision . . .[,] the [Town's]

decision is not shown to be irrational, does not violate equal protection,

and must be sustained as a matter of law." *TriHealth*, *supra*, **at 791-92.**

## V.  THE MOTION FOR SANCTIONS

The Court has previously addressed the motion for sanctions and

made the following observations:

> The motion appears to be based on an admittedly contentious
> discovery process.  Plaintiff claims that the Defendant identified
> men who simulated sex acts during dances they had with the
> Plaintiff.  When finally deposed, Plaintiff claims every individual
> now cannot identify any such individual or denies that the
> simulated sex acts occurred.  This is not quite accurate.  The
> Defendant was careful to explain in the answers to
> interrogatories that it "was the Plaintiff's practice to dance
> without a partner or dance in close proximity to various
> individuals who would be in the dancing area of the Marshall
> Depot.  To the extent that Defendant can particularly identify
> any individuals that 'partnered' with the Plaintiff they would
> include Emmitt Bullman, Dennis Brown, and the Plaintiff's son
> (Ben Fisher)."  Exhibit 1, Defendant's Response to the
> Plaintiff's First Set of Interrogatories and Request for
> Production of Documents to the Defendant Town of Marshall,
> North Carolina, *attached to* Motion, at 5.  In response to the
> following interrogatory, "identify all persons with whom you
> contend Mrs. Willis engaged in simulated sexual intercourse,"
> the Defendant identified those same three individuals.  *Id.* at 8.
> At no point in these answers did the Defendant state that the
> men engaged in the simulated sex acts; the only such
> allegation is that the Plaintiff did so.
>
> Likewise, the deposition of Everette Boone is not as compelling
> as the Plaintiff claims.  Mr. Boone testified that the Plaintiff did
> her dancing "all by herself."  Exhibit 4, Excerpts from the
> Deposition of Everett Boone, *attached to* Motion, at 49.  Mr.
> Boone's affidavit, previously filed with this Court, contains an
> allegation that the Plaintiff "and her partner would hunch on the
> floor, simulating sexual intercourse."  *Id.* at 133.  During his
> deposition, Mr. Boone frankly admitted that his averment was

not technically correct "[b]ecause her partner didn't do it," only the Plaintiff did. *Id.*

Mr. Boone's statement is corroborated by Bonnie Chandler who testified as follows:

Q. When you saw [the Plaintiff] dancing with her son at the Depot, was she dancing in a vulgar fashion?
A. Yes.
Q. When you saw her dancing with her son at the Depot, was her son dancing in a vulgar fashion?
A. No.
Q. When you saw her dancing with her son at the Depot, was she engaging in simulated sex on the dance floor with her partner.
A. Yes.
Q. How was she doing that if her son was not dancing vulgarly?
A. I don't know. She was.

Exhibit 7, Excerpts from Deposition of Bonnie Chandler, *attached to* Motion, at 60. In other words, although the Plaintiff was dancing inappropriately, her partners were not.

If the Plaintiff has evidence to the contrary, a supplement to the motion should be filed.

**Order, filed December 15, 2006, at 2-4.** The Plaintiff filed a response to

the Order which set forth additional authority. However, it did not address

the above distinctions.

The Court does not find the conduct as egregious as characterized

by the Plaintiff. This has been a vigorously, contentiously litigated matter.

There comes a point in the life of every litigation when the parties are well

advised to move forward rather than continuing to harangue about past practices.  That point has been reached in this proceeding.


## VI.  ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment is hereby **GRANTED** and the Plaintiff's motion for sanctions is hereby **DENIED**.

A Judgment is filed contemporaneously herewith.

Signed: April 12, 2007

Lacy H. Thornburg
United States District Judge